# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Jason Frank, Erich Peasley, William Waters and Robert Wilhelm

Court File No. 04-CV-1018 PJS/RLE

Plaintiffs,

vs.

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DECERTIFY COLLECTIVE ACTION**

Gold'n Plump Poultry, Inc.,

Defendant.

## INTRODUCTION

Defendant Gold'n Plump Poultry, Inc.'s ("GNP") motion presents this Court with a choice – to try this case once collectively on behalf of 244 GNP workers, or to conduct 244 separate trials with an enormous amount of repetitive testimony presented at each trial. While federal circuit courts have adopted different standards for decertification, trial courts have found the distinctions to be more theoretical than practical. Ultimately, the court must analyze "whether the trial should proceed collectively or if it should be severed." *Frank v. Gold'n Plump Poultry, Inc.*, No. Civ. 041018JNERLE2005 WL 2240336 at *2 (D. Minn. 2005) (ECF No. 63).

At its core, this case rests on a single GNP corporate policy that refuses to pay employees for time spent: (1) donning and doffing required sanitary and protective equipment; (2) cleaning themselves before and after leaving the production floor; (3) walking to and from work stations; and (4) waiting for the production line to start. GNP has long known that the law required it to pay employees for these work-related activities. GNP, however, has thumbed its nose at the Department of Labor and at its own employees. Two years ago, the United States Supreme Court made it clear in *IBP, Inc. v. Alvarez*, 126 S.Ct. 514 (2005) that GNP needs to pay for this time. Yet, GNP still maintains a corporate policy of refusing to comply with the law.

Motions to certify and decertify are forward looking exercises. When considering such a motion, the court necessarily considers how the case may be best tried to verdict. This case, including the testimony of likely witnesses, convenience of venue, and

repetitive issues and testimony demands a collective trial.  Not surprisingly, other cases involving poultry processors have been tried collectively.

Contrary to Judge Erickson's findings in her order certifying the case, GNP continues to claim that management does not control whether its employees get paid for donning and doffing.  GNP also argues that estimating uncompensated donning and doffing time will be too complex to try the case in one trial.  GNP asks the Court to buy into a self-fulfilling prophecy: allow GNP to avoid collective action status and to continue profiting from violating the FLSA because it adopted a haphazard system of employee compensation.

As will be shown, GNP's arguments are contrary to record evidence.  Decertifying the case would cause a colossal waste of judicial resources.  When the Court considers how these claims ought to be tried under the light of the remedial purposes of the FLSA, trial through a collective action is the obvious choice.

## STATEMENT OF FACTS

### I.      DONNING AND DOFFING REQUIRED GEAR AT GNP FACILITIES.

GNP is a privately held chicken processor with operations in Cold Spring and Luverne, Minnesota, and Arcadia, Wisconsin.  GNP's operation is integrated, producing chicken products for sale to consumers nationwide.  (Def.'s Brief at 4 (ECF No. 345); Am. Compl. at ¶ 8 (ECF No. 4).)  GNP currently employs over 1,000 line employees and, prior to early 2004, also employed sanitation workers in its processing plants.[1]  (Def.'s

---

[1] As of February 2004, GNP outsourced its Cold Spring sanitation needs to a company called Kaiser Services.  As of March 2004, GNP outsourced its Arcadia sanitation needs.

Brief at 7, 12, 17.)

Each of GNP's plants currently operates two shifts.  (Def.'s Brief at 4.)  At each plant, GNP assigns employees to various departments and job classifications.[2]  All employees must be on the production floor and/or at their specific work station ready to work when their shift begins.  (Ex. C at 99.)[3]  All must spend time before their shifts to retrieve and don items of sanitary and protective equipment ("gear"), and after their shift to clean, doff, and return the same gear.  (Ex. D at 57, 59-60, 75.)  Once a shift begins, all GNP employees' time is strictly regulated and monitored.  (Ex. E at 46-48.)

All opt-in employees that are line workers worked in either first processing (live receiving, evisceration) or second processing (scannable, debone, bulk), or were sanitation workers.  As reflected in the equipment policies for all three plants, all employees in first processing, second processing and sanitation must wear the same set of basic equipment – the protective equipment policies for first processing, second processing and sanitation are nearly identical.  (Ex. G at 77-78; Ex. H at 9-10; Ex. I.)

---

"Former" GNP sanitation workers were given the option of terminating their relationship with GNP to work for Kaiser Services or were terminated completely. (Ex. YY  ¶¶ 4, 6; Ex. ZZ at ¶ 3.)

[2] GNP concedes that the departments in Cold Spring are similar to those in Arcadia. (Def.'s Brief at 7 n. 3, 12.)  The Luverne plant simply consists of what is called "Further Processing."  (*Id.* at 7, 17.)

[3] "Ex. ___" refers to the exhibits attached to the Affidavit of T. Joseph Snodgrass, filed concurrently herewith.

Despite GNP's assertions to the contrary, all employees at issue in this case are required to don and doff virtually identical gear.  As one supervisor, an 18-year GNP employee, testified:

Q:      But you -- even simpler than that, just to be on the plant floor, there's a requirement that you have to have basic safety equipment?
A:      Yes, they do.

Q:      Okay.  And that basic equipment, as I understand it, includes steel-toed boots, a smock, hair nets, if necessary, ear plugs, an apron, a bump cap, and do you also have to get your surgical gloves and your rubber gloves before you hit the floor?  Is that correct?
A:      You have to get that equipment, but you don't necessarily have to have the gloves on or the sleeves on when you enter the processing floor.

Q:      And it doesn't matter if you're day shift, night shift, evis, first processing, or second processing, correct?
A:      No.

(Ex. G at 9-10.)  Another supervisor testified

Q:      All the employees in first processing, second processing, day and nights, are going to wear the basic equipment, true?
A:      True.

Q:      All the employees on first and second processing are putting on the basic equipment in some fashion before they get to the plant floor?
A:      Yes.  In order to enter the plant floor, they have to have that on, correct.

Q:      Okay.  And they will put on that basic equipment before they put on any of the peripheral equipment?
A:      Yes.  It would be a prerequisite.

(Ex. H at 77, 81.)

Some positions may also put on minor, peripheral protective equipment – such as a single kevlar glove, single sleeve protector or safety glasses.  However, very employee at issue in this case was required to wear the same basic gear including: steel-toed boots, a smock, hair nets, ear plugs, an apron, and a bump cap (hard hat).  An employee must don and doff the required basic equipment just to get on the production floor.   (Ex. G at 9-10; 10-15; Ex. H at 77, 81.)

During the two break periods allowed during a shift, Plaintiffs must remove and sanitize their gear before exiting the production floor and entering the bathrooms, the cafeteria, or other areas of the plant outside the work area.  (Ex. C at 105-107.)  Before the breaks end, Plaintiffs must then put the equipment back on and return to their work stations.  (*Id.* at 108-110; Ex. F at 67-68.)

GNP requires employees to wear and sanitize the foregoing gear both for safety and sanitary regulations of the USDA.  Wearing the gear and complying with the sanitation rules are job requirements at GNP.  (Ex. J at 34.)  An employee can be fired for failing to following these rules. (Ex. K; Ex. L, Ex. M; Ex. N; Ex. O.)

**II.    GNP'S POLICY OF IGNORING THE DEPARMENT OF LABOR'S DIRECTIVE TO PAY FOR TIME SPENT DONNING, DOFFING AND SANITIZING PROTECTIVE EQUIPMENT.**

In October and November 1997, the USDOL conducted a poultry processing survey ("First Poultry Survey") to measure compliance with the FLSA by randomly auditing 51 poultry plants.  (Ex. Q at xxi; Ex. R.)  GNP's Arcadia facility was selected for audit.  (Ex. NN.)  During the Arcadia plant audit, the agency raised a number of questions about GNP's pay and record-keeping policies, including whether GNP accurately recorded and

paid employees for time spent donning and doffing required gear.  (*Id.*)  GNP responded to the USDOL's inquiry by stating that:

> Paying employees for de minimus [sic] activities when our competitors are not doing so, would be a distinct and unfair advantage to us in the marketplace.  Consequently, before we decide exactly how to handle this issue, we'd like to wait for the survey results and react to any industry practice changes that flow from the survey.

(*Id.*)  GNP did not implement any of the USDOL's recommended changes.

In February 1998, the USDOL released the results of the First Poultry Survey, which indicated that the failure to pay for donning and doffing in poultry plants violated the FLSA. (Ex. Q at xxi-xxii; Ex. R.)  After receiving the survey results, GNP internally – and with the assistance and advice of its attorneys – acknowledged that its timekeeping policy excluded paying for donning and doffing time.  Ultimately, however, the company refused to change its policy.  (Ex. S at 21.)

The USDOL conducted a second survey of the poultry industry ("Second Poultry Survey") in 2000.  (Ex. T.)  GNP's Arcadia plant was 1 of 51 randomly selected plants. (Ex. S at 32.)  In January 2001, the USDOL published its results in a "Compliance Survey Fact Sheet."  This Survey found that every one of the surveyed plants had "extensive violations" of the FLSA.  (Ex. T.)

The USDOL reiterated its longstanding position that donning and doffing and related activities, including walking and waiting time were compensable.  (*Id.*)  The USDOL specifically set out the Department's position that time spent donning and doffing and related activities, including walking and waiting time, during break periods resulted in non-compensable breaks.  (*Id.*; Ex T.)

In March 2001, GNP senior management met with USDOL auditors who again advised that GNP needed to accurately record and pay for donning, washing, walking, waiting and doffing time.  (Ex. V; Ex. W.)  At that time, GNP was "not recording nor paying for 12 minutes per day or 1 hour per week at the beginning and end of work." (Ex. V.)

The USDOL also concluded that GNP was failing to provide employees with a thirty-minute meal period free from work.  (*Id.*)  The USDOL noted that GNP had added three minutes to the Arcadia lunch period, but found this insufficient and, as a result, found the entire thirty-minute period to be compensable, *i.e.*, an additional two-and-one-half hours per week.  (*Id.*)  The USDOL reportedly advised that it wanted GNP to comply with the FLSA and change its record keeping and pay policies.  (*Id.* )

GNP responded to the USDOL on May 14, 2001 but ignored the USDOL's directives relating to donning, doffing and related preparatory activities.  (Ex. W.)  GNP did not change any pay practice after the USDOL meeting.  (Ex. S at 78.)  In response to the USDOL's explicit directive to maintain accurate time records related to donning and doffing activities and its instruction that GNP pay for these activities, GNP advised the USDOL that the activities were "not compensable" and, as a result, it would "continue [sic] take [the USDOL's] comments under advisement and monitor this issue."  (Ex. W.) GNP similarly dismissed the USDOL's determination that employees were not getting thirty minutes free from work for their meal period.  (*Id.*)

In May 2002, the USDOL sent GNP a letter advising that it continued to violate

the FLSA and directed it to "resolve all outstanding issues" with the USDOL.[4] (Ex. X.)

GNP did nothing other than say that it would take the matter under advisement.

### III.   GNP SENIOR MANAGEMENT ESTABLISHED A UNIFORM, CONSISTENT, AND LONG-STANDING PRACTICE NEITHER TO RECORD NOR TO PAY FOR DONNING AND DOFFING.

GNP's corporate executives admit in internal documents that GNP does not pay

for donning and doffing, irrespective of employees' shifts, job duties, department and

gear, explaining that: "The majority of poultry processors, including Gold'n Plump, do

not pay workers for putting on or taking off work clothing." (Ex. EE.) GNP admitted

that "**the practice of treating donning and doffing activity as non-compensable is a**

**long-standing practice of Gold'n Plump and is consistent with industry practice**."

(Ex. FF at 4 (emphasis added).)

GNP maintains a corporate policy to refuse to pay employees for donning and

doffing and waiting and walking. (Ex. C at 151-154.) The GNP managers and

supervisors who submitted affidavits in support of GNP's motion to decertify

subsequently testified that they did not compensate for donning and doffing because it

has been GNP's longstanding, uniform "unwritten policy" not to compensate employees

for donning, doffing, sanitizing and walking time. (Ex. A at 78; Ex. B at 55-56; Ex. C at

142; Ex. E at 36-38; Ex. F at 94; Ex. G at 159; Ex. H at 10-11; Ex. P at 98; Ex. CC at 21-

22; Ex. GG at 102.)

---

[4] On June 21, 2002, poultry industry and GNP attorney, David Wylie, had a telephone conference with three USDOL attorneys, during which the USDOL attorneys further explained their position on donning and doffing, as well as on the issue concerning the compensability of the 30-minute meal period. (Ex. X.) A summary of the conference was then e-mailed to GNP's human resources director. (*Id.*)

According to GNP's former HR manager, and current plant manager at Arcadia: "What we follow a lot of it is based on past practice, and that direction comes from our corporate office."  (Ex. HH at 174.)

### A.    Supervisors Lack Authority To Change Pay Practices.

The difference between GNP's attorney-drafted supervisor affidavits and the same supervisor's deposition testimony taken a few weeks later is quite stark.[5]  In fact, one witness claimed in her affidavit that she had "autonomous decision making authority" over donning and doffing, but subsequently testified that she did not really know how donning and doffing was handled at GNP and that, if someone wanted to know about how it was done in her unit, they should depose her manager.  (Ex. DD at 25-27.)   GNP has done nothing to withdraw this affidavit from the court record.

Contrary to the GNP attorney-drafted affidavits, supervisors had nothing to do with the decision-making process concerning the compensability of donning and doffing. (Ex. S at 139-140.)  A corporate policy, not individual manager decisions, caused GNP to continue treating donning and doffing activities as non-compensable.  (*Id.*; Ex. II at 39; Ex. JJ at 47, 162-163.)

Yet, despite the corporate HR director's testimony that she made the decision not to change GNP's pay practices to compensate for donning and doffing with Executive Vice President Steve Jurek, and President and CEO Mike Helgeson, GNP claims that its upper management did not direct employees not to pay for donning and doffing. (Def.

---

[5] The Court should disregard conclusory affidavit testimony when it conflicts with sworn deposition testimony.  *Plymouth Foam Products, Inc. v. City of Becker*, 120 F.3d 153, 155 n.3 (8th Cir. 1997).

Brief at 5.)  GNP represents to the Court that it gave the authority to dictate pay practices, including the decision of whether or not to pay for donning and doffing, to each individual supervisor at its three processing plants.[6]  (*Id.*)  The testimony shows otherwise.

GNP plant workers – irrespective of their department or plant location – consistently testified that they do **not** have the authority to change GNP pay practices. Supervisors instead simply implement the policy set by corporate management and, in particular, Peggy Brown, director of human resources.  (Ex. II at 40:6-23.)

For instance, Roger Van Roekel, one of three supervisors in Luverne, testified that **none** of the Luverne supervisors have the authority to change GNP's pay practices.  (Ex. D at 49-51; Ex. JJ at 93-94.)  Alto Finken, night-shift supervisor of the bulk department at GNP's Cold Spring facility, testified similarly concerning his **entire** department's lack of authority to change employee pay practices.  (Ex. F at 48; 107; E at 96-97.)  Mindy Shultz, of GNP's Arcadia plant, likewise, testified that as a supervisor she does not have the authority to change how employees are paid.  (Ex. KK at 39; Ex. LL at 99.)

Only "the upper echelon" has the authority to pay employees for donning and doffing at the start and end of the workday.  (Ex. D at 101-102.)

---

[6] GNP makes this dubious claim despite failing to provide those supervisors with any training about what the federal or state wage and hour laws require, how "work" is defined, and what activities are or are not compensable.  (Ex. S at 137-138.)

**B.      Supervisors Have No Decision-Making Authority To Pay For Donning And Doffing.**

Supervisors at all three of GNP's processing plants consistently testified that they played no role in determining that the company's production and sanitation employees should not be paid for donning and doffing.  (Ex. A at 67; Ex. D at 50; Ex. F at 94; Ex. CC at 25-26.)  Rather, the supervisors testified time and again that they simply implement the policies dictated by corporate management.  (Ex. F at 148-149; Ex. G at 98-99; Ex. DD at 70-71.)  Any changes to existing policies or practices are dictated by and received from management, regardless of plant location and department.  (Ex. A at 58-59; Ex. B at 36-40, 50.)

One Luverne production supervisor even testified that GNP employees "probably should be getting paid [for donning and doffing], but there is nothing [fellow supervisor, Roger Van Roekel] or I are going to be able to do about it."  (Ex. JJ at 93.)  Likewise, other GNP managers and supervisors testified that employees may deserve to get paid for donning and doffing, but recognized that, ultimately, it is up to corporate management to change the policy.  (Ex. C at 152-153; Ex. D at 122, 125.)

Like the Plaintiffs in this case, the Cold Spring plant manager testified that as a former production worker he expected to get paid for all hours worked, including the time he spent donning and doffing at the plant.  (Ex. II at 79-80.)   He further testified that it was fair that his employees would also expect to get paid for every minute of donning and doffing, explaining: "I would think every employee in the United States

would want that." (*Id.* at 85.)  Nevertheless, corporate headquarters ultimately runs all three GNP plants and sets pay policy.  (*Id.* at 18, 41-42.)

## IV.  GNP MANAGEMENT REFUSED TO CHANGE PAY PRACTICES AFTER CONDUCTING A TIME STUDY AND DETERMINING THAT IT WOULD COST MILLIONS TO COMPLY WITH THE FLSA.

Since at least early 2001, GNP has known exactly how much it would cost to come into compliance with the FLSA and, in particular, exactly how much it stood to gain financially by not changing its longstanding policy of treating donning and doffing activities as non-compensable.  Sometime in 2001, at the behest of GNP management, certain GNP personnel conducted a time-motion study to determine the time it takes employees in certain departments within GNP's three plants to don, doff and complete other related preparatory activities, including walking time, before and after their shifts and lunch breaks.  (Ex. C at 14-16, 132; Ex. KK.)  GNP's study revealed that it took an average of 15.36 minutes per day for its employees to complete these activities. [7]  (*Id.*)  As part of its study, GNP determined that to pay 982 employees for this previously uncompensated time would cost the company approximately $1 million.  (*Id.*)

GNP refused to pay employees for donning and doffing because it believed it would cost too much.  As one HR employee stated in an internal document: "GNP needs to remain competitive within the Poultry Industry.  Paying employees for de minimis

---

[7] GNP's corporate designee conceded that GNP's time study, which was conducted in consultation with counsel, provides the only factual basis that would support GNP's *de minimis* defense.  (Ex. S at 10-11.)  GNP, however, has produced documents reflecting communications from counsel that clearly undermine GNP's entitlement to the *de minimis* defense.  (Ex. CC.)

activities [*i.e.,* donning and doffing] when our competitors are not doing so would be a distinct and unfair disadvantage to us in the marketplace." (Ex. S at 143-144; Ex. MM.)

GNP has obviously concluded that the cost of compliance will likely exceed its exposure in this lawsuit, as it has consistently made the calculated business decision not to come into compliance with the FLSA despite the longstanding regulations and directives of the U.S. Secretary of Labor, the USDOL's 2002 determination that GNP's pay practices violate the FLSA, and the U.S. Supreme Court's decision in *Alvarez.* (Ex. EE.) Despite the USDOL's position, GNP's corporate HR director, Peggy Brown, testified that she, Executive Vice President Steve Jurek, and CEO Mike Helgeson, simply did not "see a compelling reason to make a change at this point." (Ex. S at 139-140.)

In fact, since 1997 and up until just recently, GNP consistently waited for the rest of the poultry industry to come into compliance with the FLSA before changing any of its pay practices in response to USDOL concerns. (Ex. W; Ex. NN.) Recent physical and process-related changes made at all three plants were actually discussed and debated by corporate management – not supervisors – in early 2000 in anticipation of a second USDOL audit of GNP's Arcadia facility. (Ex. OO.) However, no changes were actually made for over six years and, to date, no changes have been made to GNP's pay practices.[8]

## II.    TIMEKEEPING PRACTICES AND CAPABILITIES AT GNP.

_____

[8] In the Fall of 2006, GNP finally began making changes to its three processing plants in an effort to lessen the time it takes employees to don, doff and sanitize their gear, and thereby the cost of paying for the same. (*See generally* Ex. QQ.) Substantively, however, the company's pay practices remain the same. (*Id.*)

GNP uses a computerized Kronos timekeeping system to record employees' time. Despite the use of Kronos, the vast majority of employees at all three GNP plants are paid according to systems known as "scheduled time" or "gang time."[9]  Upon arriving at work, employees go to the locker room and begin donning their gear.  Later, they swipe an identification card through one of several Kronos time clocks located at each plant. That card, however, is used only for attendance and not to record time worked.  (Ex. JJ at 68.)

After employees have swiped their card, have obtained and donned their gear, and have reported to the production floor ready to work, either a "gang card" is swiped by a supervisor at the employees' scheduled start time to mark the beginning of the compensated workday or the Kronos timekeeping system automatically begins to record compensated time.[10]  (Ex. A at 76-77; Ex. B at 12; Ex. P at 66, 70-72.)  Employees do not punch out or in to mark the beginning and end of either of their two breaks.  (Ex. C at 106.)  At the end of the day employees cease getting paid based on scheduled time, gang-time or their individual punch.  Regardless of the method used to stop compensation, employees are still not paid for all the time spent donning and doffing.  (Radwin Aff. ¶ 32.)

---

[9] Those employees paid based on their actual time card swipe are the exception to the rule and are either arriving early or leaving late because they have been so assigned by their supervisor.  GNP's Kronos timekeeping system accounts for such unique circumstances. (Ex. B at 17-18; Ex. E at 96, 111-112; Ex. P at 10-11, 27.)

[10] While the Kronos system records when an employee actually swipes in and out to the minute – GNP has the system round an employee's time up or down to the benefit of GNP.  (Ex. F at 87.)

GNP does not track donning, doffing, washing, walking, and waiting time, and does not track the time actually provided for lunch and rest breaks after these activities are removed.  Accordingly, GNP does not have any time records accurately reflecting the amount of time its employees spend performing the foregoing activities.  (Ex. C at 150-151.)

All of GNP's supervisors who submitted affidavits in connection with the present motion testified that they were never instructed to and did not personally track donning and doffing time, let alone pay for it. (Ex. A at 34-36, 47; Ex. B at 15; Ex. E at 18, 28-30; Ex. G at 83; Ex. H at 14; Ex. P at 34; Ex. CC at 25; Ex. DD at 15.)  There is no reason why such time could not have been accurately tracked and recorded for all employees. (Ex. A at 36-37; Ex. E at 60; Ex. G at 22; 42-44; Ex. P at 39.)

## V.   PROCEDURAL HISTORY AND GNP'S ONGOING REFUSAL TO PAY FOR TIME SPENT DONNING AND DOFFING FOLLOWING *ALVAREZ.*

This action was commenced on February 27, 2004.  Judge Ericksen certified a collective action in September, 2005.  Notice was subsequently sent to a subset of employees defined by Judge Ericksen as follows:  "Current and former employees of Gold'n Plump who have worked as line processing or sanitation employees for some period of time after January 31, 2003."  GNP identified the employees who fell within this category.[11]  Approximately 244 current and former employees opted into the FLSA collective action.

---

[11] GNP suggests through the use of different job titles that the collective action class is broader than that defined by Judge Ericksen in her Order granting certification – it is not.

In November 2005, the United States Supreme Court upheld the USDOL's interpretation of the FLSA in a unanimous decision. *IBP, Inc. v. Alvarez*, 126 S.Ct. 514 (2005). In April 2006, the USDOL sent another letter to GNP advising that it remained committed to resolving all the outstanding issues raised by its May 2002 letter. (Ex. Y.) Since that time, the USDOL has conducted additional audits of GNP's Arcadia and Cold Spring facilities. (Ex. Z.)

In May 2006, the USDOL's Wage and Hour Division publicly issued an Advisory Memorandum addressing the current state of the law after *Alvarez*. (Ex. AA.) The USDOL addressed: (1) the meaning of "work" under the FLSA; (2) the donning and doffing of so-called "non-unique" gear in processing plants; and (3) the viability, or lack thereof, of the "*de minimis*" defense. (*Id.*) The state of the law set forth in the USDOL's Memorandum runs directly contrary to the positions GNP advocates in this motion. (Def.'s Brief at 33-35.)

Over a year after the Supreme Court's decision in *Alvarez*, GNP has made no changes to any of its record-keeping or payment practices, and the federal and state wage violations have continued. While GNP recognized its lunch violation in Arcadia and consequently added an extra three minutes – ultimately deemed insufficient by the USDOL[12] in 2002 – GNP did nothing to change any other record-keeping or pay

---

Admittedly, some opt-ins worked in other areas in addition to being line workers during the class period. However, the Kronos time records clearly identify when each person worked as a sanitation or line worker.

[12] (Ex. V.)

practices in Arcadia and made no changes to its practices in its other plants.[13]  (Ex. S at 79, 80-81.)

## VI.   TIME STUDIES CONFIRM THE MANAGEABILITY OF THE CASE AS A COLLECTIVE ACTION.

### A.   All Workers Start The Donning Process And Complete The Doffing Process In The Same Fashion At All Three Plants.

As a result of *Alvarez*, the USDOL has determined that: "the compensable day starts once the employee has obtained the gear required to be stored on the premises **by taking an item out of a bin, a locker or another designated storage area**."  (Ex. PP.) In each of the plants, for all opt-in plaintiffs - whether they are line, live receiving, or sanitation workers - there is no dispute that the employees' first principal activity is to don gear in the locker room: bump caps, steel-toed boots and hearing protection.  These items are required for all positions regardless of department, position or shift.  (Ex. G at 77-78; Ex. H at 9-10; Ex. CC at 10; Ex. RR.)[14]  Similarly, the final doffing of bump caps and steel-toed boots in the locker rooms ends the payday.

---

[13] While GNP recently made some physical and process-related changes to all three of its plants, it has not changed its pay practices.  (Ex. BB.)

[14]  As a result of this litigation, GNP changed this procedure in the fall of 2006, by allowing employees to take steel-toed boots and bump caps home.  However, all of the opt-in employees worked in the plants before this change was implemented so their compensability claims predate this change.  (*See*, *supra*, at n.9.)

**B.     Professor Radwin's Time-Motion Will Reasonably Estimate Uncompensated Donning And Doffing Time While Accounting For Actual Punch Versus Scheduled Time.**

The opt-in employees all start at a set time.[15]  At the end of the shift, some workers were paid based upon their actual punch and some were paid based upon a scheduled time.  However, no worker was paid until the final moments of doffing their last piece of equipment in the locker room.  (Radwin Aff. ¶ 32.)

The daily electronic time and attendance records for each opt-in employee show the moment the employee started and stopped getting paid, and whether they were paid on a set time or actual punch.  In calculating the post-shift donning time owed to an individual employee, Professor Radwin's studies account for the differences in payment types because his time-studies analyze the entirety of the donning and doffing process and then reconcile these time periods with the actual moment the employees starting getting paid and the actual moment they stopped getting paid.  He timed hundreds of workers over the course of many days and many shifts.  (Radwin Aff. ¶ 24.)

Although some employees wait around a few moments or minutes before their line starts operating, an employee is "on the clock" after she has started donning gear.  As the USDOL has made clear, "any walking or waiting time that occurs after the employee engages" in donning is compensable.  (Ex. PP.)  Professor Radwin's studies will calculate

---

[15] There is no difference between use of a gang card or scheduled time.  GNP either set the pay system to start at a specific time, or the supervisor swipes a card at that moment.  As a result, even though GNP wants to attempt to confuse the issue, there is no material difference between use of a "gang card" and use of "scheduled time" to mark the beginning and end of compensation.  (Ex. A at 76-77; Ex. B at 12; Ex. P at 66, 70-72.)

all compensable time as articulated by *Alvarez* and the USDOL's subsequent interpretations, and then extract all paid time that GNP provides to estimate all unpaid, compensable work time.  (Radwin Aff. ¶¶ 24-31; Ex. AAA.)

In unusual situations an employee will be paid on actual punch when the employee is usually paid on a scheduled start (e.g., where an employee leaves early or arrives late). The records, however, demonstrate whether the employee was paid on actual punch or scheduled time.  Any unique situations – such as an employee leaving early – can be identified and accounted for.  (Ex. B at 17-18; Ex. E at 96, 111-112; Ex. P at 10-11, 27.)

### C.     Differences Between Live Receiving, Sanitation And Line Workers Will Be Accounted For In Professor Radwin's Studies.

Live receiving has different locker room facilities in the plant.  Professor Radwin analyzed workers in all areas, and his studies will be able to differentiate time spent by live receiving and ordinary line workers.  (Radwin Aff. ¶ 37.)

### D.     Donning And Doffing Was Not Paid During The Unpaid Lunch Breaks.

No employees in any of the plants receive compensation for time spent donning and doffing during the lunch hour.  (Radwin Aff. ¶ 34.)  All positions in all plants, with the exception of line workers at Arcadia, received only 30 minutes for lunch without any pay for donning and doffing.  (*Id.* ¶ 34.)  Although GNP added three minutes to the lunch period at the Arcadia plant, Professor Radwin's opinions will account for this difference for Arcadia opt-in employees during the lunch break.  (*Id.* ¶ 31.)

**E.     Line Workers That Walk Off The Line As The Birds Pass Do Not Change Donning And Doffing Time Calculations.**

GNP argues that certain workers are paid for some donning time at the end of the shift because payment for wages is stopped after some workers have left the line but before others have stopped working on the line.  Professor Radwin's studies account for these differences because he randomly sampled all employees – not just ones that left the line early or late – and because his studies account for the moment all sampled employees stop getting paid.  (Radwin Aff. ¶¶ 9-23; 32; Ex. AAA.)

**F.     Line Workers Moving From Department To Department Do Not Change Donning And Doffing Time Calculations.**

The fact that employees may rotate positions along the production line and/or between departments during a given workday, thereby occasionally necessitating the donning or doffing of different combinations of miscellaneous gear in the middle of a shift, will not impact Professor Radwin's calculations concerning donning and doffing pre- and post-shifts and breaks.  (Radwin Aff. ¶¶ 18-23; Ex. A at 55; B at 25-26; Ex. AAA.)  All employees must don a minimum amount of basic gear before the start of their shift, to have doffed certain gear before exiting the production floor before a break, to have re-donned the same post-break, and to doff their gear before exiting the plant at the end of the workday.  (Radwin Aff. ¶¶ 9-23; 35; Ex. G at 76-77.)

GNP's uniform practice of rotating employees from position to position on the production line actually supports a collective trial since each employee will eventually wear the same miscellaneous gear during the course of any given day, in addition to the baseline.  (Ex. G at 77-78; Ex. H at 9-10; Ex. RR.)  Because of the regular rotation

among positions, the uncompensated time employees spend donning and doffing in various positions on the production line is similar, if not the same.  (Ex. A at 56.)

## ARGUMENT

## I.   THE CASE REMAINS MOST EFFECTIVELY MANAGED AS A COLLECTIVE ACTION.

In her stage-one certification ruling, Judge Ericksen noted that a collective action should be certified if the employees at issue were "victims of a single decision, policy, or plan." *Frank*, 2005 WL 2240336 at *3.[16]  After reviewing the record, Judge Ericksen found that corporate management's failure to address the complaints of the USDOL was "evidence of a single decision sufficient to warrant certification." *Id*.  The record on this issue has not changed since Judge Ericksen's decision.

GNP's brief fails to address the USDOL's interactions with GNP's corporate management.  Nor does it mention Judge Ericksen's ruling on this issue.  GNP's failure to even address this point supports denial of this motion.[17]  Further, as Judge Ericksen found, management's steadfast refusal to comply with the USDOL's demands adversely affected line and sanitation workers every day during the class period (January 31, 2003 to the present).

Judge Ericksen also held that different time keeping methods – particularly scheduled time versus punch time – were irrelevant if employees were regularly denied

---

[16] Copies of all unpublished opinions cited herein are attached to the Affidavit of T. Joseph Snodgrass.

[17] It would be unfair for GNP to address, or provide proof, on the USDOL issue in its reply brief.  As the moving party, GNP should have addressed this issue in its opening brief to allow Plaintiffs an opportunity to respond to such evidence or arguments.

pay for donning and doffing time.  Judge Ericksen suggested that future discovery should focus on whether employees were in fact paid all of their donning and doffing time regardless of time-keeping methodology.  *Id.* at *3.

GNP did not submit any evidence that purports to show that any employee, or group of employees, is regularly paid for all donning and doffing time.  While again submitting multiple affidavits – none rebut the plain fact claimed by the USDOL, set forth in internal GNP documents, and irrefutably proven by Professor Radwin – not one line or sanitation worker is regularly paid for donning and doffing.

### A.    The Second Stage "Similarly Situated" Standard Is More Lenient Than The Rule 23 Class Certification Standard.

Judge Ericksen articulated the "second stage" standard of review as analyzing: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant that are individual to each plaintiff; and (3) fairness and procedural considerations.  *Frank*, 2005 WL 2240336, at *2 (*citing Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1102-03 (10th Cir. 2001)); *See also, Bradford v. Bed Bath & Beyond*, 184 F. Supp. 2d 1342, 1346 (N.D. Ga. 2002)).  While the second stage analysis is considered a stricter standard than the lenient "colorable basis" standard employed to conditionally certify a class under § 216(b), *Frank,* 2005 WL 2240336, at *2; *Kalish v. High Tech Inst., Inc.*, No. Civ. 04-1440, 2005 WL 1073645 *1 (D. Minn. Apr. 22, 2005), it is not true that courts rarely find employees "similarly situated" for trial purposes.  Borgen & Ho, *Litigation of Wage and Hour Collective Actions Under the Fair Labor Standards Act*, 7 EMPLOYEE RTS. & EMP. POL'Y J. 129,

135 (2003) (finding courts increasingly find employees similarly situated at the second stage.)

In fact, Section 216(b)'s similarly situated requirement is less stringent and more elastic than Fed. R. Civ. P. 23(b)(3)'s requirement that common questions "predominate." As explained in *Stone v. First Union Corp.*, 203 F.R.D. 532, 541 (S.D. Fla. 2001), under Section 216(b) "not all questions of law or fact must be common; rather, it is enough if some questions of law or fact are common to all parties, even if such questions do not predominate." *Id.* The standard is also less demanding than the prerequisite for joinder under Rule 20(a), which requires that claims arise out of the same action or occurrence, or for separate trials under Rule 42(b). *Hipp v. Liberty Nat. Life Ins. Co.,* 252 F.3d 1208, 1219 (11th Cir. 2001).

Plaintiffs' employment circumstances need not be identical to survive a motion for decertification; rather, plaintiffs need only show that their positions are similar to the positions held by the putative class members. *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005); *Hipp,* 252 F.3d at 1219. "This burden is not a heavy one." *Bradford*, 184 F. Supp. 2d at 1345. Indeed, if plaintiffs were required to be identically situated, no collective action would ever proceed through the "second stage."

### B.    At The Second Stage, The Main Consideration Is Trial Management.

While some federal courts have articulated slightly different standards for decertifying a collective action than the standard articulated by Judge Ericksen, federal district court judges have noted that the various standards for decertifying are "more theoretical than practical." *Bayles v. American Medical Response of Colo., Inc.*, 950 F.

Supp. 1053, 1058 (D. Colo. 1996).  "All approaches allow for consideration of the same or similar factors, and generally provide a district court with discretion to deny certification for trial management reasons."  *Thiessen*, 267 F.3d at 1105.

In her order, Judge Ericksen properly noted that the Court should "reconsider whether the trial should proceed collectively or if it should be severed. . ."  *Frank*, 2005 WL 2240336, at *2.  GNP's motion to decertify does not present any new material evidence that Judge Ericksen did not consider when she certified this collective action. The longstanding corporate policy to flaunt the USDOL and federal law remains in full force today.  GNP has done nothing to satisfy its substantial burden to reverse Judge Ericksen's prior order.

## II.  THIS CASE SHOULD BE TRIED COLLECTIVELY BECAUSE OF GNP'S CORPORATE POLICY TO REFUSE TO PAY FOR TIME SPENT DONNING AND DOFFING.

In this district, as in others, courts certifying collective actions will look to whether there exists a "decision, policy, or plan" that leads to the FLSA violations. *Frank*, 2005 WL 2240336 at *2-3; *Kalish*, 2005 WL 1073645 at *2-4.  The reason for the rule is obvious.  If management personnel will have to be called at serial trials, the case should be tried collectively.

Here, management's decision neither to pay for nor record donning and doffing time in response to pressure from the USDOL goes to the heart of several trial issues. These issues include: (1) whether GNP acted "willfully" to trigger application of a three year statute of limitations to the opt-in plaintiffs as opposed to a two year statute of limitations (*see* Order, *Frank*, No. 04-1028 JNE/RLE (D. Minn. Jan. 20, 2006) (ECF No.

91)); (2) whether damages should be liquidated based upon GNP's "advice of counsel" defense; and (3) whether the burden of proof on damages shifts as a result of management's decision not to record donning and doffing time in response to USDOL demands.

GNP has undeniably had a longstanding, centralized policy and practice of not paying its production and sanitation employees for time spent donning and doffing protective equipment. The GNP principals who chose to ignore the USDOL and continued this practice over the past ten years are unquestionably the key witnesses in this case.

Each plaintiff suffers under this policy and is thus similarly situated: GNP has a longstanding policy of refusing to pay anyone for all the time he or she works, in clear violation of federal wage and hour laws. (See generally, Radwin Aff.; Ex. B at 55-56; Ex. C at 142, 154; Ex. E at 37; Ex. F at 94; Ex. VV at Interrog. No. 3; Ex. P at 98.) While GNP's uniform policy concerning the compensability of donning and doffing may not appear in an employee handbook, it is nonetheless real and is applied at each of its three processing plants to all production and sanitation employees irrespective of their shift, job duties, department and gear. (Ex. E at 36-38; Ex. GG at 102.)

The practice of not paying for donning and doffing, and management's refusal to change in the face of USDOL demands, dooms GNP's motion to decertify and renders issues related to potential minor disparate factual and employment settings insufficient to defeat the bases for proceeding collectively. *Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316 (PAC), 2006 WL 2819730 at *10 (S.D.N.Y. Sept. 29, 2006). From a

practical standpoint, should the Court disagree and sever Plaintiffs' claims, the Court would then be confronted with the exact same proof 244 times over, as Plaintiffs' claims are all based on the same clear, uniform, systematically, and historically applied corporate practice. *See Id.* at *11.

GNP mistakenly relies on *Fox v. Tyson* and *Carlson v. Leprino Foods Co.* In both cases, FLSA certification was denied because of the absence of a company-wide donning and doffing pay policy. *Fox*, No. 4:99-CV-1612-VEH, slip op. at 12-13 (N.D. Ala. Nov. 15, 2006); *Carlson*, No. 1:05-CV-798 2006 WL 1851245, *5 (W.D. Mich. 2006).[18] In contrast to those cases however, and despite GNP's disingenuous assertions to the contrary, the evidence establishes that the decision regarding compensating for donning and doffing time **does not** rest with individual line supervisors or even individual plant managers, but rather with senior corporate management who singularly made the decision to continue to violate the FLSA. (Ex. A at 67; Ex. C at 142; Ex. F at 107; Ex. CC at 25-26; Ex. GG at 102; Ex. HH at 162-163; Ex. II at 40.)

GNP's supervisors do not determine whether employees can be paid from the time their workday actually starts (when they don the first piece of equipment) until the end of the day (when they last doff their final piece of equipment). Undisputedly, "supervisors don't actually make policies" and have no autonomous decision-making authority to

---

[18] Note, however, in *Carlson*, the court did find "loud and clear evidence" of a uniform policy supporting certification as to Leprino's Allendale plant based on USDOL-audit findings and company memoranda despite the presence of some disparate factual circumstances amongst class plaintiffs. *Id.*, 2006 WL 1851245 at *5-6.

change current company pay practices.  (Ex. G at 99; Ex. DD at 70-71.)[19]  Rather GNP's

supervisors merely implement the policies and practices dictated to them by corporate

management.  (Ex. II at 40; Ex. JJ at 93.)

Although GNP attempts to paint a picture in which individual supervisors make

significant policy decisions about compensation, the record shows otherwise.  Decisions

are dictated by GNP's "long-standing practice" of treating donning and doffing as non-

compensable.  (Ex. WW at Interrog. No. 3.)  It is only **within** this framework that

supervisors are trained and allowed to make decisions related to compensation.  (Ex. G at

98; Ex. LL at 99.)

### III.    GNP'S AFFIRMATIVE DEFENSES SHOULD BE TRIED COLLECTIVELY.

GNP's purported defenses do not require analysis or application as to each

individual plaintiff.  Indeed, when asked whether GNP asserted defenses against some

plaintiffs but not others, GNP stated that its "**affirmative defenses apply against named

plaintiffs as a whole**" and not merely against certain of the named plaintiffs and

collective action representatives.  (Ex. SS at Interrog. No. 7) (emphasis added.)

GNP argues that three affirmative defenses it claims require individualized trials –

the so-called "non-work," "*de minimis*," and "non-unique gear" defenses.  Not

surprisingly, GNP avoids any discussion of the advice-of-counsel defense – since it

knows the assertion of that defense is dependent upon corporate management gaining and

---

[19] *See also* Ex. A at 58-59; Ex. B at 50; Ex. D at 49-51; Ex. E at 96-97; Ex. F at 107; Ex. CC at 25-26; Ex. GG at 102; Ex. JJ at 93-94; Ex. KK at 39.

following attorney advice.  This defense, at this stage of the case, is inconsistent with

GNP's decertification arguments.

However, each defense GNP discusses in connection with the present motion not

only ignores controlling case law but also the longstanding regulations and directives of

the U.S. Secretary of Labor, which are entitled to substantial deference.  *Skidmore v.*

*Swift & Co.*, 323 U.S. 134, 140 (1944) (Administrator's FLSA interpretations "constitute

a body of experience and informed judgment to which courts and litigants may properly

resort for guidance"); *Tobin v. Flour Mills of Am.*, 185 F.2d 596, 603 (8th Cir. 1950)

(recognizing that interpretations of the FLSA by the Wages and Hour Administrator are

entitled to "respect at the hands of the courts").  Indeed, in the wake of the *Alvarez*

decision, and given the requirements of FLSA, "an employer will seldom have defenses

applicable to an employee who either works overtime and/or is paid close to minimum

wage to the extent that the employee is uncompensated for required donning and doffing

of company uniforms when performed in the workplace."  *Carlson*, 2006 WL 1851245,

*5.

A.      **"Exertion" Is Not Necessary For An Activity To Constitute "Work"
        And, As A Result, GNP's So-Called "Non-Work" Defense Is Not A
        Trial Issue.**

In two sentences, GNP appears to argue that this Court should decertify the case

because a jury has to make an employee-by-employee, piece-of-equipment-by-piece-of-

equipment analysis in order to find donning and doffing compensable.  Clearly, such an

interpretation of *Alvarez* is tortured – as *Alvarez* involved large collective actions in

poultry and meat processing plants.  There, the Supreme Court had no problem setting

forth the standards for the compensability of donning and doffing gear for employees in numerous positions in multiple plants.

In *Alvarez*, the U.S. Supreme Court reaffirmed its longstanding definition of "work" under the FLSA in a case addressing the compensability of time spent donning and doffing some of the same protective equipment at issue here.  *Alvarez*, 126 S. Ct. 514.  The *Alvarez* Court could not have been clearer: "exertion," it reiterated, "[i]s not in fact necessary for an activity to constitute 'work' under the FLSA."  *Id.* at 519.  Indeed, the Supreme Court has held in numerous cases that donning and doffing and similar activities constitute "work" under the FLSA, irrespective of the effort required to perform such activities.[20]

After discussing its historically broad interpretation of "work," the *Alvarez* Court emphasized that, other than its express exceptions for travel to and from an employee's principal activity and for other preliminary or postliminary activities, the Portal-to-Portal Act did not in any way change the Court's prior descriptions of "work."  *Id.* at 520.  According to the Court, *Mt. Clemen's* statement that "the statutory workweek includes all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace," 328 U.S. at 690-91, remains good law – and GNP

---

[20] *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690-91 (1946) (noting that the statutory workweek, which provides the basis for compensation under the FLSA, includes "all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace"); *Armour & Co. v. Wantock*, 323 U.S. 126, 132-33 (1944) (clarifying prior its prior decision in *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590 (1944) to hold that "exertion" was not necessary for an activity to constitute work).

knows it. *Alvarez*, 126 S. Ct. at 519-20. Accordingly, the time, no matter how minimal, that GNP's employees are required to don and doff protective equipment on its premises is compensable "work" under the FLSA.[21]

### B.     The So-Called De Minimis Defense Should Be Tried Or Resolved Collectively.

GNP claims that its "*de minimis* defense" raises individual issues. GNP argues that the *de minimis* defense automatically allows GNP to forego paying each employee up to 10 minutes per day. GNP is wrong. Courts have applied a "*de minimis*" principle to find otherwise compensable activities non-compensable under the FLSA. That is, even if an activity is determined to be "work" within the meaning of the FLSA and the Portal-to-Portal Act, that activity may not be compensable if it is deemed "*de minimis*" as a matter of law.

However, before an employer can assert the defense, threshold issues must be decided. Courts typically weigh three factors in determining whether certain activities are *de minimis* as a matter of law: (1) the practical administrative difficulty in recording the additional time at issue; (2) the size of the aggregate claim;[22] and (3) the regularity of the work. *Lindow v. United States*, 738 F.2d at 1057, 1062-63 (9th Cir. 1984); *see also Reich*

---

[21] Similarly, the U.S. Secretary of Labor's longstanding regulations and the USDOL's recently issued Advisory Memorandum, analyzing the impact of the *Alvarez* decision, provide that employer-required donning and doffing performed by an employee while on the employer's premises qualifies as "work" under the FLSA. 29 C.F.R. 785.7; (Ex. AA at 2.) Both the USDOL's Advisory Memorandum and its regulations are entitled to controlling deference. *Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002).

[22] "The de minimis rule applies to the aggregate amount of time for which an employee seeks compensation, not separately to each discrete activity." (Ex. AA at 3.)

*v. Monfort, Inc.*, 144 F.3d 1329, 1333-34 (10th Cir. 1998) (applying the *Lindow* factors as a

balancing test); *Davis v. Charoen Pokphand (USA), Inc.*, 302 F. Supp. 2d 1314, 1323

(M.D. Ala. 2004); *Gonzalez v. Farmington Foods, Inc.*, 296 F. Supp. 2d 912, 927-29 (N.D.

Ill. 2003); *Saunders v. John Morrell & Co.*, 1992 WL 531674, *1 (N.D. Iowa 1992).

Importantly, courts have applied the *de minimis* rule considering "the total sum or claim

involved in the litigation," *Lindow*, 738 F.2d at 1063, as well "the total number of

workers." *Reich*, 144 F.3d at 1334.[23]

The *Lindow* test favors a collective action trial.  Here, the Plaintiffs already

developed evidence from corporate management proving that there was no impediment to

GNP recording donning and doffing time.  Further, the USDOL demanded, without

success, that GNP management start to record such time.  Applying these facts to the case

law, it is clear GNP cannot assert the *de minimis* defense.

The U.S. District Court for the Northern District of Iowa, after having read and

analyzed over fifty cases on the issue, recognized that the courts were evenly divided

regarding how much time is considered *de minimis*.  *Saunders*, 1992 WL 531674 at *1.

However, "the cases **uniformly** observe that the 'rule applies **only** where there are

uncertain and indefinite periods of time involved of a few seconds or minutes duration,

**and** where **the failure to count such time is due to considerations justified by**

**industrial realities**." *Id.* (emphasis added).  Accordingly, "[a]n employer may not

---

[23] According to the U.S. Secretary of Labor, the size of the aggregate claim at issue
should be gauged, at minimum, on a daily basis.  Supplementary Brief of Amici Curiae
U.S. Secretary of Labor, *Tum v. Barber Foods, Inc.*, 2003 WL 23415986 (1st Cir. 2003)
(recognizing cases where time has been aggregated beyond a daily basis, ranging up to
three years).

arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him."  29 C.F.R. § 785.47 (2007) (citations omitted).

Here, GNP's management concedes that the donning and doffing time could have been recorded.  There was no impediment to recording the time at issue since GNP has a state of the art wage and hour system.[24]  As a result, the *de minimis* defense cannot be asserted in this case.

Even if GNP prevails on this common issue at trial, which it will not, the next *Lindow* factor also contemplates a collective action trial.  The trier of fact considers the total aggregate claim.  Here, GNP's and Professor Radwin's time studies confirm that the aggregate donning and doffing claim involves millions of dollars of uncompensated wages.  GNP's own 2002 time-motion study indicates that employees spend 15.36 minutes per day completing donning and doffing activities, including walking time, before and after their shifts and lunch breaks.  (Ex. KK.)  As of that time, GNP determined it would cost the company approximately $1 million to pay for donning and

---

[24] *See Gonzalez*, 296 F. Supp. 2d at 929 (recognizing the fact that defendant's Kronos system could capture employee time to the precise minute weighed against a finding that the activities in dispute were *de minimis*); *accord Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1414 (5th Cir. 1990) (holding that defendant could not successfully claim that waiting periods of less than 15 minutes were *de minimis* because of administrative impracticalities where the method of tracking actual work time employed by defendant could continue to be used with only minor changes); *Saunders*, 1992 WL 531674 at *2 (rejecting defendant's assertion that plaintiff meatpacking employees' claims involved amounts of time so uncertain or indefinite that the failure to count the time was justified by industrial realities "in this day of technology" and refusing to apply *de minimis* rule).

doffing.  *Id.*  This evidence, common to the class, weighs against the application of the *de minimis* doctrine and favors a collective action resolution.[25]

The standard of proof and evidence necessary for the Court to determine whether the activities at issue are *de minimis* do not require an individualized inquiry.  The record evidence common to each opt-in member establishes that: (1) the time at issue here exceeds the perceived ten-minute *de minimis* threshold;[26] (2) GNP has the administrative means to record donning and doffing activities; (3) Plaintiffs don, doff and sanitize their equipment on a regular basis; and (4) the amount of time spent on such activities when aggregated, amounts to a substantial claim.  This evidence will be the same whether the Court and jury hears it once or 244 times.  As such, GNP's tenuous *de minimis* defense requires this Court to find Plaintiffs similarly-situated, precluding decertification on such grounds.

### C.    GNP's "Non-Unique Gear" Defense Does Not Raise Individual Issues.

No individual issue concerning the nature of the gear worn by Plaintiffs trumps or dilutes the issue at the heart of this case: whether GNP's uniform policy of not paying for

---

[25] The fact that individual employees' total unpaid donning and doffing time is unlikely to be identical is of little practical consequence to the Court's determination of the pending motion to decertify.  *See* Def.'s Brief at 34.  This issue goes to the calculation of damages, not to the merits of Plaintiffs' claims and it does not defeat certification. *Carlson*, 2006 WL 1851245, *6 (holding that differences in individual damages calculations are manageable and insufficient to defeat approval of collective action); *Bradford*, 184 F. Supp. 2d at 1345; *Trotter v. Perdue Farms, Inc.*, No. Civ. A. 99-893 – RRM, 2001 WL 1002448, *2 (d. Del. Aug. 16, 2001).

[26] Even if the Court follows a ten minute rule without considering the threshold *Lindow* test, which it should not, the record establishes that Plaintiffs have pierced the purported *de minimis* ten (10)-minute threshold.  (*See* Radwin Aff. ¶ 32; Ex. KK; Ex. XX at 3.)

donning and doffing is lawful.  Each Plaintiff suffers under this policy and is thus similarly situated: no Plaintiff is paid for all the time he or she works, in clear violation of the federal and state laws that govern employees, and irrespective of what type of gear he or she wears.[27]  "[W]hether required gear is "unique" or "non-unique" is irrelevant to whether donning and doffing is a principal activity" and is therefore, compensable.  (Ex. AA at 3.)  Indeed, it has been the Secretary of Labor's longstanding position "that the donning and doffing of **all** protective gear is compensable as 'hours worked.'"  Brief of Amici Curiae U.S. Secretary of Labor, *Alvarez v. IBP, Inc.*, 2002 WL 32154024 (9th Cir. 2002) (emphasis added); *see also* 29 C.F.R. § 790.8, n. 65 (2007) (providing that any clothes changing on the employer's premises, which is required by law, the employer, or the nature of the work is compensable").

GNP's reliance on *Reich v. IBP, Inc.*, 38 F.3d 1123, 1127 (10th Cir. 1994) and *Anderson v. Pilgrim's Pride Corp.*, 147 F. Supp. 2d 556, 561 (E.D. Tex. 2001) for the proposition that the time spent donning and doffing "non-unique" gear is non-compensable is sorely misplaced.  These courts concluded that the donning and doffing of so-called "non-unique" gear was not compensable because such activities were not "work" within the courts' perceived meaning of the FLSA.  Both courts mistakenly defined "work" as requiring physical or mental exertion.  *Reich*, 38 F.3d at 1125; *Anderson*, 147 F. Supp. 2d at 562.  However, as Plaintiffs have already explained, the

---

[27] Further, Professor Radwin attests that the minor variations in the combinations of protective equipment worn by subclasses of employees does not present an obstacle to estimating average donning and doffing time at GNP's facilities.  (Radwin Aff. ¶ 32; Ex. AAA.)

Supreme Court's "work" term includes non-exertional acts; "exertion [is] not in fact necessary for an activity to constitute work under the FLSA." *Alvarez*, 126 S. Ct. at 519; *see* discussion, *supra*, at Section III (A).[28]  Thus, this Court should not be persuaded by the two cases relied upon by Defendant in support of decertification based on its purported "non-unique" gear defense.[29]  GNP's motion to decertify based on any such defense should be denied.

### D.   GNP's Assertion Of The "Advice-Of-Counsel" Defense Requires This Court To Find All Plaintiffs Similarly Situated.

In an effort to escape liability for liquidated damages[30] resulting from its failure to pay employees for time spent donning, doffing, and sanitizing gear in violation of the

---

[28] The Supreme Court in *Alvarez* did not rule directly on the compensability of donning and doffing "non-unique" gear because it was conceded or the courts below held that donning and doffing of the gear at issue in these cases was integral and indispensable to the employees' principal activities.  *Id.* at 521.  The Ninth Circuit in *Alvarez*, 339 F.3d 894, 903-04 (9th Cir. 2003), however, indicated that the "specific tasks" of donning and doffing "non-unique" gear, while integral and indispensable to the employees' principal activities, were nonetheless not compensable because they were "de minimis as a matter of law."  *Id.*  In so holding, the Ninth Circuit misapplied the *de minimis* doctrine by applying it to discrete acts.  Rather, the *de minimis* rule, as set forth in *Lindow* and its progeny, "applies to the **aggregate** amount of time for which an employee seeks compensation, not separately to each discrete activity, and particularly not to certain activities 'as a matter of law.'  The Supreme Court's continuous workday rationale [in *Alvarez*] renders the Ninth Circuit's 'de minimis as a matter of law' discussion untenable."  (Ex. AA (emphasis added)); *see also* discussion, *supra*, at Section III(B).

[29] A number of courts have rejected the reasoning of *Reich* and *Anderson*.  *See, e.g., Davis*, 302 F. Supp. 2d at 1322, n.8; *Fox v. Tyson Foods, Inc.*, No. CV-99-TMP-1612-M, slip op. at 23-26 (N.D. Ala. Feb. 14, 2001).

[30] An employer who violates the Fair Labor Standards Act ("FLSA") "shall be liable" for liquidated damages.  29 U.S.C § 216(b).  Further, if an employer is found to have acted willfully, it will be liable for three years of back-pay, not merely two years.  29 U.S.C. § 255(a).  An employer may avoid paying double damages only if it can show that it acted

FLSA, GNP has asserted – although, not in connection with its present motion – that it acted in "good faith" and had reasonable grounds to believe that it was in compliance with the Act based upon the advice of counsel.  (Ex. SS at Interrog. No. 1.)

GNP does not have in-house counsel and relies on the Briggs and Morgan law firm for legal advice.  In its interrogatory response, GNP states that two lawyers – Michael Thomas Miller (Briggs and Morgan) and David R. Wylie (Jackson Lewis, LLP) – will testify at trial that they periodically advised GNP management of about FLSA requirements.  (Ex. TT.)

Attorneys Miller and Wylie dealt only with GNP's Owner and CEO, Mike Helgeson, Executive Vice President, Steve Jurek, and Director of Human Resources, Peggy Brown.  (Ex. S at 139-140.)[31]  GNP supervisors and plant managers never received attorney advice about the compensability of donning and doffing.  (Ex.A at 62; Ex. D at 90-91; Ex. P at 73-75; Ex. S at 127-128; Ex. CC at 29-30; Ex. II at 168-169; Ex. JJ at 166; Ex. GG at 61-62.)

The simple fact that this defense is being asserted by GNP supports the finding that Plaintiffs are similarly situated and calls for a single, collective trial.  To hold otherwise creates the very real likelihood of inconsistent rulings **and** will require that

---

in "good faith" **and** that it had reasonable grounds to believe that its conduct was not violating the FLSA.  29 U.S.C. § 260; *Braswell v. City of El Dorado*, 187 F.3d 954, 957 (8th Cir. 1999).

[31] All of the corporate personnel identified above work and reside in Minnesota, whereas Attorney Wylie resides in Baltimore, Maryland.  Attorney Wylie is seriously ill and, as a result, could not be expected to attend serial trials. (Ex. UU.)

certain defense counsel,[32] as well as both parties' experts, be called to testify in 244 separate trials on the exact same subject matter utilizing the exact same standard of proof and evidence.

Moreover, there is no evidence in defense counsel's attorney-files that the advice rendered, concerning the compensability of donning and doffing, was particular to any individual employee, department or plant.   Thus, determination of the validity of GNP's defense and whether it will ultimately be subject to liquidated damages and a three-year as opposed to a two-year statute of limitations requires no individualized inquiry and is properly submitted for collective adjudication.

## IV.   PLAINTIFFS WILL RELY ON THE SAME DAMAGES PROOF FOR ALL OPT-INS MAKING COLLECTIVE TRIAL APPROPRIATE.

No one disputes that the 244 claimants are "employees" of GNP under the FLSA. There is no claim that any opt-in plaintiff worker was an exempt employee.[33]   No unions or collective bargaining agreements are involved for any opt-in worker.   Not surprisingly, federal courts have explicitly held that, in a collective action, there is no need "to present the testimony of each underpaid worker."   *Herman v. Hogar Praderas de Amor, Inc.*, 130 F. Supp. 2d 257, 265 (D.P.R. 2001).   Rather, as proposed here, FLSA damages may be proved by "a representative sample of employees." *Id.*

---

[32] In light of Attorney Wylie's health concerns and his inability to appear for a single deposition, it is similarly unlikely that he would be able to testify at 244 individual trials.

[33] All opt-in plaintiffs were hourly employee.   The rates started at $ 8.55 and averaged approximately $12.00 per hour.

Because the issues decided in *Alvarez* are no longer subject to debate, the FLSA trial in this case will focus on two issues: (1) the amount of uncompensated time it takes employees to don and doff personal protective equipment; (2) whether GNP can carry its burden of showing that uncompensated time should not be doubled, or liquidated, because its corporate executives relied upon the "advice of counsel" in not paying for donning and doffing.

At trial, Plaintiffs will use the same expert witness to estimate the amount of uncompensated donning and doffing time at issue for all opt-in members.[34]  *Reich v. Southern New England Tele. Corp.*, 121 F.3d 58, 67 (2d Cir. 1997) (where no time records exist, employee need only approximate time at issue to carry their burden on damages).  Plaintiffs' damages expert, Professor Robert Radwin of the University of Wisconsin, is an industrial and biomechanical engineer.  He designed time-motion studies at each of GNP's three plants.  His methodologies were the same in each plant.  Professor Radwin's methodologies were generic to the job categories at issue – his studies are not unique to any particular opt-in plaintiff.  To a high degree of engineering certainty, he will tell the jury the amount of time it takes in the various plants to don and doff – pre-shift, post-shift and during breaks.  *Nash v. Resources, Inc.*, 982 F. Supp. 1427, 1435 (D. Or. 1997).  Simple formulae, based upon the number of work days during the collective action period and the time periods of payment, will then be used to reasonably

---

[34] Since GNP chose not to record the actual time spent donning and doffing, GNP – not the Plaintiffs – will bear the ultimate burden at trial of proving that Plaintiffs estimates are not reasonable.  *Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 31 (2d Cir. 2002).

estimate the amount of uncompensated time for each employee.[35]   The use of a time

study will not be challenged  – since GNP conducted its own internal time studies to

determine the amount of uncompensated donning and doffing time.

**V.      THE LOCATION OF WITNESSES FAVORS PROCEEDING COLLECTIVELY.**

Since the opt-in employees will be relying on Professor Radwin's studies, there

will be no need to call all 244 opt-in plaintiffs to trial.  Moreover, even if there was some

theoretical need to call numerous witnesses at each plant this Court's location is

convenient to all the opt-in plaintiffs and GNP.  Geographically, the epicenter of the three

plants, and GNP's corporate headquarters in St. Cloud, is the Twin Cities:[36]



---

[35] For example, an employee that worked three weeks would not seek the same amount as an employee that worked three years.

[36] Indeed, the Arcadia plant is closer to the Twin Cities than the courthouse for the Western District of Wisconsin.  Further, since the Arcadia, Wisconsin plant is right across the Minnesota border near Winona, several opt in plaintiffs are Minnesotans.

Trying this case collectively is consistent with federal case law and avoids serial courts and juries having to deal with Professor Radwin's time motion studies more than 200 times. It also avoids the disruption that would result from repetitive personal testimony from the hundreds of line workers.

## VI. FAIRNESS REQUIRES THAT THIS CASE CONTINUE TO PROCEED COLLECTIVELY.

FLSA Section 216(b)'s objective of lowering costs and limiting the controversy to one proceeding to efficiently resolve the common issues of law and fact present in this case is met by allowing Plaintiffs to proceed collectively before this Court. *Evans v. Lowe's Home Ctrs., Inc.,* No. 3:CV-03-0438, 2006 WL 1371073, *5 (M.D. Pa. May 18, 2006). However, should the Court disagree with Plaintiffs and decide to sever the causes of Jason Frank, Erich Peasley, William Waters, Robert Wilhelm and those of the 240 opt-in plaintiffs here, Plaintiffs would respectfully request that the Court stay its decertification order for a period of sixty (60) days during which time the plaintiffs may re-file their individual claims. *Smith*, 404 F. Supp. 2d at 1155 (tolling decertification order for period of 60 days "to toll any applicable statute of limitation" and "allow those individual plaintiffs adversely affected to pursue their individual claims"); *Fox v. Tyson Foods, Inc.*, No. 4:99-CV-1612-VEH, Order at 2 (N.D. Ala. Nov. 15, 2006) (allowing plaintiffs 30 days post-decertification to re-file individual claims).

Upon re-filing, this Court will then have, in addition to the claims of the four named Plaintiffs, 240 similar yet separate actions before it for individual consideration, all requiring the same standard of proof and all utilizing the same evidence and the same

fact and expert witnesses to resolve what are truly common allegations and claims.  To require the named plaintiffs and 240 other opt-in plaintiffs to prove their common allegations individually however, as opposed to proffering the evidence of GNP's uniform and historical practice of not paying for donning and doffing just once in a representative action, would result in exactly that which Section 216(b) seeks to avoid – the inefficient use of judicial resources.  *Glass v. IDS Financial Services, Inc.*, 778 F. Supp. 1029, 1081 (D. Minn. 1991) (denying defense motion to decertify ADEA collective action); *see also Torres*, 2006 WL 2819730 at *11 (granting certification and recognizing that one FLSA collective action is a more effective use of the court's and parties' resources than 300 separate suits).

## CONCLUSION

In light of all the foregoing, a collective action is clearly the "most fair and efficient way" to resolve this particular lawsuit and can be easily managed despite GNP's assertions to the contrary.  As such, GNP's motion to decertify should be denied.

Dated this 8th day of February, 2007.       **LARSON • KING, LLP**


By    s/Shawn M. Raiter
T. Joseph Snodgrass, #231071
Shawn M. Raiter, #240424
Kelly A. Swanson #0330838
2800 Wells Fargo Place
30 East 7th Street
St. Paul, MN 55101
***Telephone: (651) 312-6500***

**ZIMMERMAN REED, P.L.L.P.**
J. Gordon Rudd, Jr., #222082
Anne T. Regan #333852
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
***Telephone: (612) 341-0400***

   **ATTORNEYS FOR PLAINTIFFS
AND COLLECTIVE ACTION
REPRESENTATIVES**

lk1190299